IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL L. FREDRICKSEN, | ) | |
| | ) | Case No. 06 C 2285 |
| Plaintiff, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| UNITED PARCEL SERVICE CO., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Daniel Fredricksen ("Fredricksen" or "Plaintiff") filed suit against defendant United Parcel Service Co. ("UPS" or "Defendant") alleging discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12101 et seq. UPS moves for summary judgment on all claims. For the reasons set forth below UPS's Motion for Summary Judgment is granted.

## STATEMENT OF UNDISPUTED FACTS

UPS is a company engaged in the business of facilitating global commerce, including the delivery of packages via air transport.[1] (Pl. 56.1 Resp. at ¶ 3.) UPS hired Fredricksen in 1992 to

---

[1] Citations to Plaintiff's "Rule 56.1(b)(3)(A) Response to Defendant's Statement of Material Facts" have been abbreviated to "Pl. 56.1 Resp." Citations to "UPS's Response to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts" have been abbreviated to "Def. 56.1 Resp."

The Court notes with considerable displeasure that the parties have failed to comply with L.R. 56.1. That rule allows a party opposing summary judgment to file a statement of undisputed material facts consisting of "short numbered paragraphs." The rule further allows the opposing party to file a "concise response" to the moving party's statement of undisputed material facts. Ignoring that obligation, Plaintiff has filed a statement of undisputed material facts that contains numerous lengthy paragraphs that one cannot characterize as "short." Additionally, in Plaintiff's Rule 56.1(b)(3)(A) Response to Defendant's Statement of Material Facts, Plaintiff admitted certain statements and/or denied certain statements, but then improperly included additional facts in his response paragraphs.

Making matters worse, Defendant's Response to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts also fails to comply with L.R. 56.1. Specifically, Defendant included with this response a "Reply in Support of

1

work as an aircraft maintenance technician ("AMT" or "aircraft mechanic") at UPS's gateway at

O'Hare Airport in Chicago, Illinois (the "O'Hare gateway"). (Pl. 56.1 Resp. at ¶ 4.) From 2004

through May 2006, Fredericksen worked as an afternoon-shift aircraft mechanic at the O'Hare

gateway. (Pl. 56.1 Resp. at ¶ 7.) During this time, Fredricksen generally reported to Supervisor

Essey Kinfe ("Kinfe"). (Pl. 56.1 Resp. at ¶ 11.) In addition, UPS employee Scott Crane ("Crane")

served as Fredricksen's Manager from early 2004 until UPS employee Sam Mize ("Mize") assumed

the position in April 2005. (*Id.*) At all relevant times, UPS and the the International Teamsters

Local 2727 (the "Union") were parties to a labor agreement that governed the terms and conditions

of Fredricksen's employment. (Pl. 56.1 Resp. at ¶ 6.)

As a member of the afternoon crew, Fredricksen was responsible for performing pre-

departure inspections and preparing planes for their nightly, on-time departures. (Pl. 56.1 Resp. at

¶ 8.) The morning crew, in contrast, typically performed arrival service extended ("ASE")

inspections and made necessary repairs after the aircraft arrived. (*Id.*) The parties dispute which of

the two inspections - pre-departure inspections or ASE inspections - was more extensive. (Pl. 56.1

---

Its Local Rule 56.1(a)(3) statement of Material Facts." Defendant did not seek leave to file this extra document, which is not contemplated by L.R. 56.1.

Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. *Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, *8 (N.D. Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1). The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) ("Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (collecting cases)). "A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005) (citing *Midwest Imports Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) for the proposition that "[a] local rule of a federal district court is written by and for district judges to deal with the special problems of their court, and we are disposed therefore to give a district judge's interpretation of his court's local rules . . . considerable weight."). Accordingly, this Court would have been justified in disregarding a substantial portions of Plaintiff's L.R. 56.1 papers and would also have been justified in disregarding Defendant's reply, which are nowise contemplated by L.R. 56.1, in its entirety. Nevertheless, in the interest of resolving the parties' dispute as efficiently as possible, the Court has endeavored to wade through the parties' non-compliant documents in resolving the parties' motions.

Resp. at ¶ 8.)  The parties also dispute and the record is unclear as to the level of inspection required to perform the pre-departure inspection.  (Pl. 56.1 Resp. at ¶¶ 10, 60.)  By mid-2004, Fredricksen had approximately thirty years of experience inspecting aircrafts.  (Def. 56.1 Resp. at ¶ 110.)  He had previously received a commendation from UPS for his assistance in developing inspection guidelines.  (*Id.*)  Crane had also previously likened Fredricksen's attention to detail to that of a brain surgeon.  (*Id.*)

Fredericksen and Crane had, at times, a contentious working relationship.  (Pl. 56.1 Resp. at ¶ 14.)  The record indicates that, between December 2002 and February 2004, Fredricksen filed five grievances (one on his behalf and four on behalf of other non-disabled UPS employees) related to Crane's allegedly harassing behavior, called the UPS Employee Help Line to complain about Crane's behavior, and wrote a letter to UPS management reporting that Crane was responsible for certain threats, palpable harassment, duress, and criminal conversion.  (Pl. 56.1 Resp. at ¶¶ 12 -13; Pl. Ex. A, Fredricksen Dep. at 266-67.)  In addition to Fredricksen's grievances, UPS received multiple complaints regarding Crane's conduct towards other, non-disabled UPS employees.[2]  (Pl. 56.1 Resp. at ¶ 17.)  Mechanic Paul Batzel ("Batzel") described the work environment at the O'Hare gateway as hostile for most mechanics between mid-2004 and mid-2006.  (Pl. 56.1 Resp. at ¶ 20.)  Batzel also testified that working relations between management and Fredricksen had always been fairly contentious, that sometimes the friction between management and mechanics centered on one individual more than another, and that hostility increased overall in 2005.  (Pl. 56.1 Resp. at ¶ 21; Pl. Ex. E, Batzel Dep. at 100-01.)

---

[2] Union stewards Dave Horning, Paul Suchecki, and Paul Batzel testified, however, that UPS supervisors and management subjected Fredricksen to more harassing treatment than other AMTs at the Chicago gateway.  (Def. 56.1 Resp. at ¶ 137.)

In February 2004, Fredricksen received preliminary test results indicating that he may have Chronic Lymphocytic Leukemia ("leukemia"). (Pl. 56.1 Resp. at ¶ 12; Pl. Ex. A, Fredricksen Dep. at 273.) Fredricksen did not inform anyone of these results at the time. (Pl. Ex. A, Fredricksen Dep. at 273.) Fredricksen also testified that, in early 2004, he became substantially limited in the major life activity of procreating, but did not inform UPS of this limitation. (Pl. 56.1 Resp. at ¶¶ 36-37.)

July 2004 Pre-Departure Inspections Restriction

On March 5, 2004, Crane met with Fredricksen and two other Union Stewards, apologized to Fredricksen for his actions, and told Fredricksen that he was committed to improving their working relationship. (Def. 56.1 Resp. at ¶ 136.) In May 2004, Fredricksen informed Crane of his preliminary test results, which indicated that he may have leukemia, but noted that he was waiting on additional test results. (Def. 56.1 Resp. at ¶ 99.) In addition, Fredricksen told Crane that his doctor suggested he attempt to avoid stressful conditions. (Def. 56.1 Resp. at ¶ 99.)

In the months following this conversation, Crane disciplined Fredricksen twice. First, on May 21, 2004, Crane verbally disciplined Fredricksen for allegedly exceeding the prescribed level of inspection when performing pre-departure inspections. (Pl. 56.1 Resp. at ¶ 61.) On July 2, 2004, Crane disciplined Fredericksen again for allegedly going beyond the prescribed levels of inspection when conducting pre-departure inspections and prohibited Fredricksen from performing any future pre-departure inspections unless directed to do so by UPS management. (*Id.*; Def. 56.1 Resp. at ¶ 109.) In his deposition, Crane explained that he imposed the prohibition for two reasons: (1) he believed that Fredricksen used an inappropriately excessive level of inspection in an effort to ground

an aircraft that was safe for flight, and (2) Fredericksen told Crane he would not change his level of inspection.  (Pl. 56.1 Resp. at ¶ 62.)

Despite this restriction on pre-departure inspections, Fredricksen was allowed to and did continue to work on aircrafts.  (Def. 56.1 Resp. at ¶ 116; Pl. Ex. A, Fredricksen Dep. at 175.) Specifically, Fredricksen continued to perform all of his other job responsibilities, including troubleshooting, replacing components, ordering parts, fueling, preparing headsets for departure, and other aircraft maintenance related tasks.[3]  (Pl. 56.1 Resp. at ¶ 65.)  While he continued to perform all of his other job responsibilities, Fredricksen testified that, "for the most part," he was assigned to perform back room filing duties, including verifying paperwork and completing the paperwork of other mechanics.  (Def. 56.1 Resp. at ¶ 116.)  Two UPS supervisors admitted that Crane directed them to assign Fredricksen tasks such as processing paperwork.  (Def. 56.1 Resp. at ¶ 117.)  Crane, Mize, and Kinfe agreed that Crane never directed them to assign Fredricksen menial tasks due to his health.  (*Id.*)

### June 2004 Failure to Sign the Log Book

On June 15, 2004, Kinfe verbally warned Fredericksen that he violated UPS policy when he failed to sign the aircraft log book, which resulted in the plane departing with an open item in violation of UPS policy and federal regulations.  (Pl. 56.1 Resp. at ¶ 66; Def. 56.1 Resp. at ¶ 118; Pl. Ex. A,  Fredricksen Dep. at 141-42.)  Batzel testified that it was not uncommon for management

---

[3]  Plaintiff disputes this statement of fact and notes that, "for the most part," he was "relegated to performing back room filing duties after Crane prohibited him from conducting pre-departure inspections." (Pl. 56.1 Resp. at ¶ 65; Def. 56.1 Resp. at ¶ 116.)  Under the Local Rules of the Northern District of Illinois, a summary judgment response claiming insufficient information to admit or deny is improper and constitutes an admission.  *Vlasek v. Vill. of Homewood*, No. 01 C 5870, 2004 U.S. Dist. LEXIS 10422, at *2 (N.D. Ill. June 27, 2004) (*citing McGuire v. United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir. 1998)).  Fredricksen's statement that,  "for the most part," he performed back room filing duties does not properly support a denial of the fact that Fredricksen continued, at least to some degree, to perform all of his other job responsibilities.  Thus, the Court deems this fact admitted for the purposes of summary judgment.

to speak with an AMT when the AMT failed to sign the log book.  (Pl 56.1 Resp. at ¶ 68.)  When a failure to sign the log book resulted in the departure of an aircraft with an open item, a more serious situation resulted because the departure of an aircraft with an open item violates federal rules.  (*Id.*; Def. 56.1 Resp. at ¶ 118; Pl. Ex. E, Batzel Dep. at 93-94.)

Diagnosis and Disclosure of Leukemia

In December 2004, Crane was diagnosed with leukemia.  (Pl. 56.1 Resp. at ¶ 23.) Fredricksen informed Crane, Kinfe, and other mechanics of his confirmed diagnosis in January 2005.  (Pl. 56.1 Resp. at ¶ 25.)  In approximately February or March 2005, Fredricksen was informed that

his leukemia was at stage 0.   (Pl. 56.1 Resp. at ¶ 23; Pl. Ex. A, Fredricksen Dep. at 34-35.)

June 2005 Warning Letter

As a mechanic, Fredricksen was required to pass a recurrent recertification test in order to maintain his annual DC8 CAT certification.  (Pl. Ex. A, Fredericksen Dep. at 37; Pl. 56.1 Resp. at ¶ 73.)  UPS guidelines required management to inform an employee ninety days before the certification expired that the employee had thirty days to take and pass the training test.  (Pl. 56.1 Resp. at ¶ 74.)  Employees who failed to do so were subject to a documented verbal warning.  (*Id.*) The parties dispute whether Kinfe conveyed this thirty-day warning to Fredricksen.  (Pl. 56.1 Resp. at ¶ 53.)

On June 1, 2005, Fredricksen complained to Kinfe that Crane's prohibition on pre-departure inspections interfered with his ability to perform his job and was discriminatory and harassing.  (Pl. 56.1 Resp. at ¶ 122.)  The following day, Kinfe issued Fredricksen a documented verbal warning for failing to take and pass the recertification test within the required thirty-day period.  (Pl. 56.1

Resp. at ¶ 76.) Kinfe also instructed Fredricksen to take the test by the end of June. (Pl. 56.1 Resp. at ¶ 76; Def. 56.1 Resp. at ¶ 122.) Despite this instruction, Kinfe returned again on June 3, 2005 and directed Fredricksen to take the test immediately. (Def. 56.1 Resp. at ¶ 122.) Fredricksen then took and failed the recertification test on June 3, 2005. (*Id.*) According to UPS guidelines, an employee who fails the certification test upon his first attempt is required to retake the test within fifteen days. (Def. 56.1 Resp. at ¶ 124; Pl. Ex. U, Procedures - Maintaining Certification.) However, Fredricksen was only afforded seven days to retake the recertification test. (Def. 56.1 Resp. at ¶ 124; Pl. Ex. A, Fredricksen Dep. at 237-38.) Nevertheless, Fredricksen passed the test upon his second attempt. (Def. 56.1 Resp. at ¶ 124; Pl. Ex. A, Fredricksen Dep. at 238.)

On June 10, 2005, UPS convened a fact-finding hearing regarding Fredricksen's failure to pass the recertification test on his first attempt and issued Fredricksen a warning letter ("June 10 letter"). (Pl. 56.1 Resp. at ¶ 77; Def. 56.1 Resp. at ¶ 123.) Fredricksen filed a grievance on or about June 20, 2005 because he believed that UPS improperly issued the June 10, 2005 warning letter. (Def. 56.1 Resp. at ¶ 130; Pl. Ex. Q, Pl. Ans. Interr. at 15.)

Fredricksen testified that he became substantially limited in the major life activities of working and walking in mid-2005, but admits that he was able to work five days a week for at least eight hours or longer. (Pl. 56.1 Resp. at ¶¶ 33-34.)

## July 2005 Working Suspension

UPS relies on its mechanics to work overtime to ensure that aircrafts will be repaired in a timely manner and packages are delivered as guaranteed. (Pl. 56.1 Resp. at ¶ 82.)

On the night of July 6, 2005, Kinfe asked AMT Dave Horning ("Horning"), who was not disabled, and Fredricksen to work overtime on an engine test run. (Pl. 56.1 Resp. at ¶ 84.)

At approximately 1:45 a.m. on July 7, 2005, Fredricksen and Horning learned that they could not conduct the engine test run for at least four hours. (Def. 56.1 Resp. at ¶ 126; Pl. Ex. A, Fredricksen Dep. at 116.) Thirty minutes later, Fredricksen filled out his time card and punched out before obtaining permission to do so from a UPS supervisor. (Def. 56.1 Resp. at ¶ 126; Pl. 56.1 Resp. at ¶ 86.) When Fredricksen and Horning explained to Supervisor Alex Restrepo ("Restrepo") that they could not conduct the test run for hours, Restrepo told them he did not want them to leave. (Def. 56.1 Resp. at ¶ 127; Pl. Ex. A, Fredricksen Dep. at 117.) Fredricksen explained to Restrepo that he was tired after working twelve hours and lacked stamina because he had leukemia. (Def. 56.1 Resp. at ¶ 127; Pl. Ex. A, Fredricksen Dep. at 117.) Restrepo did not ask Fredricksen to punch back in or force him to stay at work after learning about Fredricksen's illness. (Def. 56.1 Resp. at ¶ 127; Pl. 56.1 Resp. at ¶ 88; Pl. Ex. A, Fredricksen Dep. at 117.)

The following day, Horning informed Kinfe of the exchange that occurred between Restrepo and Fredricksen. (Def. 56.1 Resp. at ¶ 128.) In response, Kinfe stated, "The company can't do that. He has a condition. They have to respect that."[4] (Def. 56.1 Resp. at ¶ 128; Pl. Ex. F, Horning Dep. at 16.)

Less than two weeks later, UPS initiated a fact-finding hearing regarding the July 7, 2005 incident. ( Def. 56.1 Resp. at ¶ 130; Pl. Ex. Q, Pl. Ans. Interr. at 17.) Because UPS had previously issued Fredricksen a verbal warning and a written warning letter, Crane subsequently issued Fredricksen the next step of progressive discipline - a Notice of Intent to Suspend - on July 21, 2005

---

[4] UPS objects to Horning's testimony as inadmissible hearsay. (Pl. 56.1 Resp. at ¶ 45.) Hearsay is an out of court statement offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Fredricksen is not offering Kinfe's out of court statement to prove the truth of the matter asserted, for example, that Fredricksen actually had a condition and that UPS had to respect that. Rather, he is offering the statements to show Kinfe's belief regarding Fredricksen's condition at the time. As such, they are not hearsay and are admissible. Fed. R. Evid. 803(3).

for allegedly failing to work as directed. (Pl. 56.1 Resp. at ¶ 89.) The suspension was a thirty-day "working suspension." (*Id.*) Thus, Fredricksen was not demoted, suspended, terminated, and did not lose any pay as a result of the suspension. (Pl. 56.1 Resp. at ¶¶ 90-91.)

In response, Fredricksen filed another grievance on July 30, 2005, stating that the issuance of the Notice of Intent to Suspend violated the ADA, federal law, and the labor agreement. (Def. 56.1 Resp. at ¶ 132; Pl. Ex. Q, Pl. Ans. Interr. at 17.) Prior to July 6, 2005, Fredricksen had not requested an accommodation to work a restricted number of hours. (Pl. 56.1 Resp. at ¶ 83.)

### July 2005 Employee Help Line Report

One day prior to filing his grievance relating to the Notice of Intent to Suspend, Fredricksen called the UPS Employee Help Line to report that a hostile work environment existed for all UPS mechanics at the O'Hare gateway due to the actions of Crane and others. (Pl. 56.1 Resp. at ¶ 15; Pl. Ex. A, Fredricksen Dep. at 211-12.) The complaint also referred to Manager Mize physically threatening employees.[5] (Def. 56.1 Resp. at ¶ 138; Def. Rep. Ex. 1, Fredricksen Dep. Ex. 26.) Fredricksen did not mention his medical condition during the call. (Pl. 56.1 Resp. at ¶ 15.)

UPS Human Resources spoke with Crane about the complaint. (Pl. 56.1 Resp. at ¶ 16.) UPS Human Resources also met with employees at the O'Hare gateway and inquired as to the work environment at the O'Hare gateway, any issues that had arisen, and how to resolve those issues. (Def. 56.1 Resp. at ¶ 139; Pl. Ex. E, Batzel Dep. at 57-58.) Even though Mize's behavior violated

---

[5] In its Response to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts UPS denies that the complaint referred to Mize and contends that the complaint did not "expressly reference[] manager Sam Mize physically threatening employees." (Def. 56.1 Resp. at ¶ 138) (emphasis added). In support of this contention, UPS cites to a UPS Compliance Report detailing Fredricksen's complaint, which does not expressly reference Mize. (*Id.*) As noted earlier, a summary judgment response claiming insufficient information to admit or deny is improper and constitutes an admission. *Vlasek*, 2004 U.S. Dist. LEXIS 10422, at *2. This Compliance Report does not properly support a denial of the fact that Fredricksen *referred to* Mize's alleged physical threats in his complaint, only that Mize was not expressly referenced in the Compliance Report. Thus, the Court deems this fact admitted for the purposes of summary judgment.

the Company's zero-tolerance policy related to workplace violence, UPS only mandated that Mize receive coaching and counseling as a result of his physical threats. (Def. 56.1 Resp. at ¶ 140; Pl. Ex. C, Crane Dep. at 178-79.)

Fredricksen's First Request for Accommodation

On August 9, 2005, Fredricksen submitted a written request to UPS for an accommodation under the ADA. (Pl. 56.1 Resp. at ¶ 47.) Specifically, Fredricksen requested that he be able to use his two "option weeks" (which he could use as paid vacation) to take off from work on a day-to-day basis for medical reasons, as opposed to taking one of the weeks in a week-long block, as provided by the labor agreement. (Pl. 56.1 Resp. at ¶ 47; Pl. Ex. A, Fredricksen Dep. at 138-39.)

The following day, UPS sent Fredricksen the ADA accommodation paperwork and instructed him to return the forms to UPS within the next two weeks. (Pl. 56.1 Resp. at ¶ 48.) Upon receipt of the forms, Fredricksen conveyed to the UPS Occupational Health Manager his belief that one of the required forms - a questionnaire - was vague and that it led him to believe that the form was drafted to either disqualify an individual as disabled under the ADA or show that the person was unable to perform the job. (Def. 56.1 Resp. at ¶ 142; Pl. Ex. A, Fredricksen Dep. at 150-51.) UPS did not attempt to modify the forms to remedy Fredricksen's concerns. (Def. 56.1 Resp. at ¶ 142.) When Fredricksen did not timely submit the forms, the Company sent Fredricksen a reminder letter, informing him that UPS would consider his request withdrawn if he did not submit the completed forms by September 8, 2005. (*Id.*; Pl. 56.1 Resp. at ¶ 49.)

On August 23, 2005, Fredricksen filed a charge with the EEOC, alleging that UPS violated the ADA. (Pl. 56.1 Resp. at ¶ 92; Pl. Ex. A, Fredricksen Dep. at 53.) On September 7, 2005, before UPS became aware of the EEOC charge, UPS forced Fredricksen to take a temporary duty ("TDY")

assignment in Michigan scheduled for later that month. (Pl. 56.1 Resp. at ¶ 93.) While the labor agreement requires UPS to post the TDY assignment for seven days before forcing an employee to take the assignment, Fredricksen's TDY assignment posted, according to Fredricksen, for six days as of September 7. (*Id.*)

Fredricksen never submitted the required Request for Medical Information forms to UPS. (Pl. 56.1 Resp. at ¶ 54.) As a result, on September 12, 2005, UPS sent Fredricksen a letter informing him that they considered Fredricksen to have withdrawn his request for accommodation. (Pl. 56.1 Resp. at ¶¶ 50, 54.) That same day, the UPS Aircraft Maintenance District received notice of Fredricksen's EEOC Charge. (Pl. 56.1 Resp. at ¶ 92; Def. Ex. 2, Crane Decl. ¶ 9; Pl. Ex. A, Fredricksen Dep. at 53.)

On October 6, 2005, Fredricksen filed a grievance regarding the TDY assignment, alleging that UPS violated the ADA. (Def. 56.1 Resp. at ¶ 144.)

### October 2005 Fact-Finding Hearing

As part of his duties in 2005, Fredricksen was responsible for updating and maintaining the technical publications at the O'Hare gateway. (Pl. 56.1 Resp. at ¶ 96.) On October 7, 2005, UPS convened another fact-finding hearing to discuss with Fredricksen a missing revision to a technical publications manual. (Pl. 56.1 Resp. at ¶ 96; Def. 56.1 Resp. at ¶ 144.) Supervisors Kinfe and Steve Northcott spoke with Fredricksen about the missing revision, but Supervisor Mize ultimately decided not to discipline Fredricksen. (Def. 56.1 Resp. at ¶ 144; Pl. 56.1 Resp. at ¶ 97; Pl. Ex. A, Fredricksen Dep. at 76.) Thus, the fact-finding hearing did not result in discipline. (Pl. 56.1 Resp. at ¶ 97.)

### March 2006 Medical Documentation

On October 21, 2005, Fredricksen attended his first appointment with Dr. Nick Kouchis ("Dr. Kouchis").[6] (Pl. 56.1 Resp. at ¶ 39; Pl. Ex. H, Kouchis Dep. at 15.) According to Dr. Kouchis, Fredericksen's chief complaints at the time of this appointment were nasal congestion, nasal discharge, and a sore throat. (Pl 56.1 Resp. at ¶ 39; Def. 56.1 Resp. at ¶ 101; Pl. Ex. H, Kouchis Dep. at 15.) Fredricksen also informed Dr. Kouchis that he had difficulty breathing. (Pl. 56.1 Resp. at ¶ 39; Pl. Ex. H, Kouchis Dep. at 66.) Dr. Kouchis concluded that Fredericksen's leukemia was in remission as of October 21, 2005. (Pl. 56.1 Resp. at ¶ 39.)

On March 16, 2006, Fredricksen provided UPS with a medical letter drafted by Fredricksen for signature by Dr. Kouchis. (Pl. 56.1 Resp. at ¶ 43.) The letter informed the reader that Fredricksen had a chronic medical condition that would result in periods of extreme fatigue, muscle fatigue, shortness of breath, substantial difficulty breathing when the condition was exacerbated, and high susceptibility to sinus complications. (Def. 56.1 Resp. at ¶ 106.) Dr. Kouchis believed that a request for short rest periods did not conflict with his understanding of Fredricksen's medical condition, yet he would not have independently initiated such a request of Fredricksen's behalf. (*Id.*; Pl. 56.1 Resp. at ¶ 44.) In addition, he stated that the "intensity of the letter was a little bit higher than [his own] assessment would [have been]." (Pl. 56.1 Resp. at ¶ 43; Pl. Ex. H, Kouchis Dep. at 66.)

With regard to his difficulty breathing, Fredricksen testified that he first informed UPS management that he was substantially limited in the activity of breathing when he provided the March 2006 letter to management. (Pl. 56.1 Resp. at ¶ 30.) Fredricksen suffers from chronic sinusitis, which is associated with his medical condition. (Def. 56.1 Resp. at ¶ 103.) Prior to

---

[6] Dr. Kouchis, began treating Fredricksen in October 2005 and met with Fredricksen on three occasions during the course of Fredricksen's treatment. (Pl. 56.1 Resp. at ¶ 105.)

submitting the March 2006 medical letter, Fredricksen periodically discussed his trouble breathing with Kinfe. (Def. 56.1 Resp. at ¶ 101.) Fredricksen had also frequently discussed his walking limitations, including his issues climbing the stairs to an aircraft, with UPS employees and had mentioned the issue to Kinfe. (*Id.*)

In early 2006, Fredricksen sought treatment for chest pains caused by the stress he sustained at the O'Hare gateway. (Def. 56.1 Resp. at ¶ 146.)

### UPS's Failure to Immediately Expunge Fredricksen's File

Fredricksen filed yet another grievance in March 2006 when UPS failed to adhere to an August 2005 arbitrator ruling that directed UPS to expunge all discipline issued to employees on or after March 16, 2005 that related to the employees maintaining DC8 CAT certification. (Def. 56.1 Resp. at ¶¶ 132-33.) With respect to Fredricksen, the ruling required the Chicago management team, which included Mize and Kinfe, to remove the June 10 letter from Fredricksen's file. (*Id.*) Fredricksen requested that UPS remove from his file the June 10, 2005 letter as well as the July 21, 2005 Notice of Intent to Suspend, which was issued in part because of the previous June 10 letter. (Def. 56.1 Resp. at ¶ 134.) UPS did not remove the June 10, 2005 letter until May 2006. (Def. 56.1 Resp. at ¶ 133.) UPS maintains that the failure to remove the letter was unintentional, (*id.*), and that UPS could not have used the Notice as a means to support termination of Fredricksen because both the Union and UPS knew that the warning letter was no longer active. (Def. 56.1 Resp. at ¶ 134; Pl. Ex. C, Crane Dep. at 154-55.)

### Fredricksen's Transfer to Arizona

On April 6, 2006, Fredricksen submitted to UPS his second request for an accommodation under the ADA, seeking that he be reassigned to a vacant AMT position in Tucson, Arizona because.

he was substantially limited in the activity of breathing. ((Pl. 56.1 Resp. at ¶¶ 45, 51.; Pl. Ex. A, Fredricksen Dep. at 161.) Fredricksen also submitted a bid for the posted vacancy pursuant to the labor agreement bidding process. (Pl. 56.1 Resp. at ¶ 52.) In response, UPS sent Fredricksen a letter informing him that he was awarded the bid for the posted vacancy in Arizona and that, as a result, his second request for accommodation was moot. (*Id.*)

In May 2006, Fredricksen transferred to the UPS facility in Tucson, Arizona. (Pl. 56.1 Resp. at ¶ 53; Def. 56.1 Resp. at ¶ 147.) Fredricksen testified that he transferred because of a "hostile work environment" and because the weather in Arizona would make Fredricksen less susceptible to falling sick. ( Def. 56.1 Resp. at ¶ 147.) As of the date of his deposition, Fredricksen held the position of a morning-shift AMT at the Tucson, Arizona UPS facility. (Pl. Ex. A, Fredricksen Dep. at 14-15.) As a morning-shift AMT, Fredricksen conducts ASE inspections on aircrafts. (Pl. Ex. A, Fredricksen Dep. at 20.) By transferring to Arizona, Fredricksen left his three children and five grandchildren who live in the Chicagoland area. (Pl. 56.1 Resp. at ¶ 53; Def. 56.1 Resp. at ¶ 147.)

### Fredricksen's Medical Condition

Based on his treatment of Fredricksen from October 2005 through March 2006, Dr. Kouchis did not believe Fredricksen was substantially limited in the life activities of breathing, walking, or procreating. (Pl. 56.1 Resp. at ¶ 42; Def. Ex. 10, Kouchis Dep. at 39-40.) Fredricksen takes one drug, Singulair, to aid with his difficulty breathing. (Pl. 56.1 Resp. at ¶ 29;Def. 56.1 Resp. at ¶ 103.) Several specialists who tested Fredricksen did not find any anatomical, pathological, or physiological cause for Fredricksen's shortness of breath. (Pl. 56.1 Resp. at ¶ 40.) In addition,

Fredricksen has never been hospitalized or missed work on account of his difficulty breathing. (Pl. 56.1 Resp. at ¶ 29.)

With respect to walking, Fredricksen stated that he is unable to walk for long periods of time and that he did not have the stamina to walk continuously from the airport entrance to the departure gate. (Pl. 56.1 Resp. at ¶ 33; Pl. Ex. A, Fredricksen Dep. at 107.) There "have also been occasions" when Fredricksen could not walk the aisles of a grocery store without sitting down. (Def. 56.1 Resp. at ¶ 102; ; Pl. Ex. A, Fredricksen Dep. at 107.) Fredricksen admits that he did not leave work on account of this limitation, had no doctor-issued medical restrictions on how long he was able to walk, and was not in therapy to improve his walking. (Pl. 56.1 Resp. at ¶ 33.) Fredricksen also admits that, during the period at issue, he was able to perform the essential functions of his AMT job, which included: (1) bending, stooping, standing, walking, and crawling for the duration of the work day and (2) working various shift schedules, including, but not limited to, five days per week for ten hours per day. (Pl. 56.1 Resp. at ¶ 35.)

No members of UPS management made any discriminatory remarks to Fredricksen about his medical condition between January 1, 2005 and May 2006 when he transferred to Arizona. (Pl. 56.1 Resp. at ¶ 26.)

**STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v.*

*Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

## I.    Discrimination and Failure to Accommodate Claims

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Discrimination," as proscribed by the ADA, generally encompasses two distinct claims: disparate treatment and failure to provide a reasonable accommodation. *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997) (internal quotations and citations omitted). This Court has also discussed the possibility of a third type of discrimination claim - hostile work environment -  under 42 U.S.C. § 12112(a). *See Fredricksen v. United Parcel Service Co.*, No. 06 C 2285, 2006 U.S. Dist. LEXIS 76121, *15-16

(N.D. Ill. Oct. 19, 2006); *see also Silk v. City of Chicago*, 194 F.3d 788, 803 (7th Cir. 1999) (*quoting Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996)) ("[A hostile work environment] claim 'would seem to arise under the general prohibition of discrimination with respect to the terms or conditions of employment contained in . . . § 12112(a).'").

While these claims entail separate analytical frameworks, a plaintiff must make a predicate showing that he is a "qualified individual with a disability" in order to succeed on the ADA claims. *See Sieberns*, 125 F.3d at 1022; 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined, in relevant part, as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Thus, the plaintiff must prove that he is "disabled," as defined by the ADA, before he may avail himself of the substantive anti-discrimination provision set forth under 42 U.S.C. § 12112(a).

UPS contends that Fredricksen has not submitted sufficient evidence to create a triable issue as to whether he is disabled for purposes of the ADA. Therefore, the Court must address this threshold issue before it may proceed to the unique aspects of Fredricksen's claims.

## A. Qualified Individual With a Disability

An individual is considered disabled under the ADA if: (1) he has an impairment that substantially limits one or more of his major life activities; (2) he has a record of such impairment; or (3) his employer regards him as having such an impairment. *See* 42 U.S.C. § 12102(2). "Major life activities" are those activities that are of "central importance to . . . daily life," including, "performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Sears*, 417 F.3d at 798 (*citing Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184,

198 (2002)); 29 C.F.R. § 1630.2(i).  An impairment only rises to the level of a disability under the ADA if the impairment "substantially limits" one or more of these major life activities.  *See* 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(j).[7]

Fredricksen contends that, as a result of his leukemia, he is substantially limited in the major life activities of working, breathing, and procreating or, in the alternative, that UPS regarded Fredricksen as being substantially limited in the major life activity of working.  As explained below, Fredricksen has not set forth sufficient evidence to create a triable issue as to whether he is "disabled."

### i. Section 12101(2)(A): Substantially Limiting One or More Major Life Activities

To establish a substantial limitation in a major life activity, a plaintiff must show that, during the relevant time period, the plaintiff was either "prevented or severely restricted" from performing a major life activity.  *See Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006) (*citing Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195-99 (2002)).  This "prevented or severely restricted" standard is a difficult standard to meet.  *Id.*  The plaintiff "must present evidence that the impact of the limitation is 'permanent or long-term,' and that 'the extent of the limitation . . . in terms of [the plaintiff's] own experience . . . is substantial.'"  *Stein v. Ashcroft*, 284 F.3d 721, 726 (7th Cir. 2002) (*quoting Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002)).  Whether an individual meets the ADA's definition of disabled requires an individualized, case-by-case analysis.  *See DePaoli v. Abbott Labs.*, 140 F.3d 668, 672 (7th Cir. 1998).

---

[7] According to ADA regulations, "substantially limits" means: (I) "[u]nable to perform a major life activity that the average person in the general population can perform" or (ii) "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1).

In the context of summary judgment, it is the plaintiff's burden to demonstrate that he can "'come up with evidence to show he could meet his ultimate burden of showing [a] . . . recognized disability.'" *Stein*, 284 F.3d at 727 (*quoting Contreras v. Suncast Corp.*, 237 F.3d 756, 763 (7th Cir. 2001). Therefore, the record presented must reflect sufficient evidence from which the fact finder could conclude that Fredricksen's leukemia prevented or severely restricted his ability to walk, breath, and procreate.

**a. Major Life Activity of Walking**

Fredricksen claims that he is substantially limited in the major life activity of walking. To prove this claim, Fredricksen must show that his limitation is "permanent or long term, and considerable compared to the walking most people do in their daily lives." *EEOC v. Sears*, *Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005).

Fredricksen asserts that he did not have the stamina to walk continuously from the airport entrance to the departure gate and that there "have been occasions" when he has not been able to walk up and down the aisle at the grocery store. In addition, Fredricksen also stated that he had difficulty climbing the stairs to an aircraft. These unsupported assertions cannot establish that Fredricksen was prevented or severely restricted in his ability to walk. *See Stein*, 284 F.3d at 726-27; *McPhaul v. Bd. of Cmm'rs*, 226 F.3d 558, 564 (7th Cir. 2000) (self-serving testimony,without more, is insufficient for a reasonable jury to find that plaintiff is a qualified individual with a disability).

Even if the Court were to accept these statements as true, such statements are insufficient to survive summary judgment. Fredricksen fails to present any evidence, medical or otherwise, regarding the specific nature and severity of his claimed disability, the duration or expected duration

of the impairment, or any long term impact resulting from the impairment. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999) (plaintiff must prove disability through not only medical diagnosis of impairment but also its effect on plaintiff). Absent such evidence, the Court cannot conclude that the stated limitations were so severe as to constitute a "substantial impairment." *See, e.g.*, *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 785 (7th Cir. 2007) (statements that plaintiff walked with difficulty and needed breaks every thirty minutes are insufficient absent evidence of specific limitations, such as time or distance); *Burks v. Wisconsin Dept. of Trans.*, 464 F.3d 744, 756 (7th Cir. 2006) (statement that plaintiff "cannot sit for more than one to three hours at a time" is insufficient to prove a substantial impairment where plaintiff failed to explain her symptoms or tender medical records in support of her claim). Fredricksen admits that he was able to perform the essential functions of his job (which includes walking for the duration of the work day), that he has never needed to leave work on account of this difficulty in walking, and that he is not in therapy to improve his walking. *Compare Scheerer*, 443 F.3d at 920 (no substantial limitation as to walking where plaintiff relied on a cumbersome protective boot and experienced intermittent neuropathy, but was able to walk and complete his work duties during an eight-hour shift), *with Sears*, 417 F.3d at 802 (substantial limitation where plaintiff was unable to walk more than one city block without her right leg becoming numb before it became "nearly impossible" to walk and she felt as though she had to lift her legs with her hands to take each step). Furthermore, Fredricksen had no doctor-issued medical restrictions regarding the length or duration as to which he was able to walk and one

of Fredricksen's own doctors testified that he did not believe that Fredricksen was substantially limited in the activity of walking.[8]

Thus, Fredricksen cannot establish a triable issue as to wheter he is substantially limited in the major life activity of walking.

### b. Major Life Activity of Breathing

Fredricksen next contends that he is substantially limited in the major life activity of breathing. Specifically, Fredricksen contends that, in connection with leukemia, he suffers from chronic sinusitis, which impacts his ability to breathe. This claim fails for many of the same reasons stated above.

Aside from stating that he had "substantial difficulty breathing" or "trouble breathing" during the relevant period, Fredricksen does not submit any evidence regarding the specific limitations of his condition that prevented or severely restricted his ability to breathe. *See, e.g.*, *McCoy v. City of Chicago*, No. 02 C 4973, 2004 LEXIS U.S. Dist. 14545, at *6-8 (N.D. Ill. July 28, 2004) (no substantial limitation when plaintiff suffered from chronic sinusitis and allergic rhinitis, but plaintiff controlled the condition and failed to present evidence illustrating that it substantially limited a major life activity). Fredricksen takes one pill to aid with difficulty breathing and has never missed work or been hospitalized on account of these breathing problems. In addition, specialists did not find any anatomical, pathological, or physiological cause for Fredricksen's shortness of breath and

---

[8] Despite Plaintiff's arguments to the contrary, Defendant's reliance on Dr. Kouchis's testimony does not create a dispute of fact regarding Fredricksen's impairment. While Dr. Kouchis "complied with" a medical letter drafted by Fredricksen for signature by Dr. Kouchis, Dr. Kouchis's testimony as to his belief that the intensity of the letter was "a little bit higher" than his assessment at the time does nothing more than further clarify his assessment of the nature and severity of Fredricksen's condition. Nevertheless, the Court need not rely on Dr. Kouchis's testimony regarding the medical letter because Fredricksen fails to submit sufficient evidence from which a fact finder could conclude that Fredricksen was substantially limited in the major life activity of walking.

Dr. Kouchis testified that he did not believe Fredricksen substantially limited in the activity of breathing.[9]  Given Fredricksen's failure to submit evidence establishing that he was prevented or severely restricted in his ability to breath, the Court finds that no reasonable trier of fact could conclude that Fredricksen's chronic sinusitis constituted a disability within the meaning of the ADA. *Compare Radaszweski v. Metro. Water Reclamation Dist.*, No. 96 C 8320, 2000 U.S. Dist. LEXIS 1051, at *21-23 (N.D. Ill. Feb. 2, 2000) (nasal polyposis and chronic sinusitis substantially limited plaintiff's breathing where evidence indicated that his claimed disability was "an ongoing condition which caused deterioration of the bones and tissues in his sinuses and necessitated . . . multiple surgeries and the insertion of a metal clip to support the structure around his eye").

### c. Major Life Activity of Procreating

Finally, Fredricksen contends that he is substantially limited in his ability to procreate.  UPS argues, among other things, that it cannot be held liable under the ADA based on this purported impairment because there is no evidence that UPS had actual or constructive knowledge of the claimed disability.  Fredricksen admits that he never informed anyone at UPS of his claimed inability to procreate, nor is there any evidence indicating that UPS was on notice of this alleged inability.  The Seventh Circuit has repeatedly held that  "an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability." *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995); *see also Adkins v. Briggs & Stratton*, 159 F.3d

---

[9]  While Fredricksen does not expressly rely on the March 2006 medical letter, the Court notes that the statements made therein - that Fredricksen had "shortness of breath" and "substantial difficulty breathing on days when his condition is exacerbated" - also fail to establish that Fredricksen was prevented or severely restricted in the major life activity of breathing as compared to the average population.  Such statements do not provide specific facts and cannot, without more, defeat a motion for summary judgment.

306, 307 (7th Cir. 1998) (no employer liability when employer had no knowledge of employee's narcolepsy).

Accordingly, the Court concludes, as a matter of law, that Fredricksen cannot establish a claim that he is substantially limited in the activity of procreating.[10]

## ii. Section 12101(2)(C): "Regarded As" Disabled

The conclusion that Fredricksen cannot establish that he is disabled under 42 U.S.C. § 12102(2)(A) does not end the Court's inquiry. Under 42 U.S.C. § 12102(2)(C), individuals who are 'regarded as' having a disability are also considered "disabled" within the meaning of the ADA. *See* 42 U.S.C. § 12102(2)(C). To be 'regarded as' having a disability, "a plaintiff must prove that either: (1) the employer mistakenly believed the employee has a physical impairment that substantially limits a major life activity; or (2) the employer mistakenly believes that an actual, nonlimiting impairment substantially limits a major life activity." *Nese v. Julian Nordic Construc. Co.*, 405 F.3d 638, 641 (7th Cir. 2005) (*citing Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001)). If, however, "the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 938 (7th Cir. 2007) (internal quotations omitted).

The plaintiff must select the major life activities that he will attempt to prove under the "*regarded as*" prong. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001). Fredricksen argues that UPS regarded him as substantially limited in the major life activity of working. With

---

[10] Because UPS had no knowledge of the claimed inability to procreate, this Court need not explore whether Fredricksen's claimed inabilty to procreate would otherwise establish a disability, as defined by the ADA.

respect to the major life activity of working, the standards applicable to the actual disability also apply to the perceived disability. *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 954 (7th Cir. 2000). Thus, to demonstrate that UPS viewed Fredricksen as substantially limited in the ability to work, Fredricksen must meet a "demanding standard" and show that UPS regarded him as "'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005) (*quoting* 29 C.F.R. § 1630.2(j)(3)(i)). Because Fredricksen relies on the major life activity of working, he must also present "'evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g., 'few,' 'many,' 'most') from which an individual would be excluded because of an impairment.'" *Id.* (*quoting* 29 C.F.R. Pr. 1630, App. § 1630.2(j)). Further, the perceived impairments must substantially limit employment generally; an impairment that precludes an employee from performing either a narrow range of jobs or a particular specialized job is insufficient. *Id.* at 613 (*citing Stein v. Ashcroft*, 284 F.3d 721, 725 (7th Cir. 2002) and 29 C.F.R. Pt. 1630, App. § 1630.2(j)).

Fredricksen contends that UPS believed that Fredricksen's leukemia precluded him from performing "the full range of mechanic duties." (Pl. Opp. Mem. 6.) There is no question that UPS was aware of Fredricksen's leukemia; UPS admits that Fredricksen informed Crane of the possibility of leukemia in May 2004 and informed various supervisors of the confirmed diagnosis as early as January 2005. At issue is whether UPS perceived Fredricksen's leukemia as substantially limiting his ability to work. Fredricksen answers in the affirmative and argues that UPS's perception of Fredricksen as substantially limited in the activity of working may be established through

circumstantial evidence. Specifically, Fredricksen contends that the following occurrences illustrate UPS's alleged misperception: (1) the allegedly disproportional "harassment" UPS directed at Fredricksen; (2) Fredricksen's ability to work without an accommodation and the July 2005 "working suspension"; and (3) Crane's actions barring Fredericksen from performing pre-departure inspections. However, the Court concludes that these three events, whether considered in isolation or together, cannot establish that UPS regarded Fredericksen as substantially limited in his ability to work.[11]

First, Fredricksen's argument that UPS management "harassed" Crane more often than they "harassed" other employees fails to support a conclusion that UPS regarded Fredricksen as significantly restricted in the ability to work. Fredricksen bases this argument on the testimony of Horning, Suchecki, and Batzel that UPS subjected Fredricksen to more harassment than other UPS employees. Such evidence is not indicative of UPS's alleged belief that Fredricksen was substantially limited. Even if the Court were to assume that the testimony accurately reflected the environment at the O'Hare gateway during Fredricksen's tenure, such treatment does not illustrate a general bias or perception as to Fredricksen's ability to work. Because Fredricksen's evidence does not speak to UPS's perception of Fredricksen's ability to perform the major life activity of working, it does not support an inference that UPS regarded Fredricksen as disabled. *See, e.g.*, *Olbrot v. Denny's Inc.*, No. 97 C 1578, 1998 U.S. Dist. LEXIS 12990, at *6-7 (N.D. Ill. Aug. 18,

---

[11] An employee must file an EEOC charge within 300 days of the alleged discrimination. *Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004). Consequently, alleged discriminatory acts that do not fall within the relevant 300-day period generally are untimely and are precluded from consideration by the Court. *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995). Nevertheless, an employee may still use the untimely acts "as background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002). Therefore, this Court will consider acts that do not fall within the relevant 300-day period as background evidence when examining Fredricksen's claims.

1998) (employer "regarded" plaintiff waitress as substantially limited in her ability to work in the "general sense" where supervisor asked plaintiff not to report to work and told the plaintiff that since she was diagnosed with cancer she looked "like shit," was no longer a good waitress, and had no right to continue working at the restaurant in light of her condition).

In a similar vein, Fredricksen's ability to work as a mechanic despite his medical condition and the thirty-day "working suspension" fail to create an inference that UPS regarded him as significantly restricted his ability to work. To the contrary, the circumstances leading up to the suspension lend further support to UPS's contention that UPS did not regard Fredricksen as disabled. The record reflects that Fredricksen continued to work full-time without an accommodation and could, at least to some degree, work overtime. On July 6, 2005, Kinfe requested that Fredricksen stay late in order to work with other aircraft mechanics; he did not prohibit Fredricksen from working. Similarly, while the parties dispute whether UPS was justified in suspending Fredricksen in July 2005, the suspension was a thirty-day "working suspension." During this time, Fredricksen continued to work and did not lose any wages as a result. Such actions, which kept Fredricksen at work and working on aircrafts, do not establish that UPS perceived Fredricksen as significantly restricted in the major life activity of working.

Finally, Fredricksen argues that Crane's decision to bar Fredricksen from performing pre-departure inspections supports an inference that UPS attempted to "undermine" Fredricksen and "dismantle his responsibilities as a mechanic" as soon as Fredricksen apprised Crane of his leukemia.[12] (Pl. Opp. Mem. 5.) Fredricksen effectively argues that he should prevail on summary

---

[12] Fredricksen also submits that one cannot believe Crane's justification for imposing the restriction because Crane's deposition testimony reveals a question of credibility, which must be resolved by the jury. (Pl. Opp. Mem. at 5.) As discussed below, the Court does not and need not rely on Crane's testimony in order to conclude that the working

judgment because evidence that Crane was aware of Fredricksen's medical condition combined with evidence that Crane barred Fredricksen from performing pre-departure inspections reveals that Crane "'concocted' a pretextual justification" for the pre-departure inspection restriction. *See Nese*, 405 F.3d at 642. However, as explained by the Seventh Circuit in *Nese v. Julian Nordic Construc. Co.*, 405 F.3d at 642, the question of whether an employer regards an employee as disabled and whether an employer discriminates against the employee are two separate legal questions.

In *Nese*, the plaintiff, Louis Nese, filed suit against his employer alleging that his employer terminated him because he was epileptic. *Id.* at 639. Specifically, Nese contended that his employer mistakenly believed that Nese was severely restricted in the major life activity of working. *Id.* at 642. Absent any direct evidence connecting the epilepsy to his employer's actions, Nese argued that the evidence presented revealed that his employer "'concocted' a pretextual justification" for his termination. *Id.* at 641. The *Nese* court rejected this argument, concluding that a plaintiff must first establish that he is disabled before a court may examine the reasons for the employment action at issue. As noted by the court,

> An employer is not guilty of discrimination every time it takes an employment action for one reason, but provides a different explanation to the employee. For example, perhaps the employer terminates an employee simply because her supervisor does not get along with her. That might not be a reason the employer wants to admit openly, so, instead, work deficiencies -- real or imagined -- are cited as the basis for the action. Even though we could wish such shenanigans never happened, we suspect they do, and they do not violate the employment laws unless, for instance, the real reason the supervisor dislikes the employee is based on some protected characteristic. . . . In other words, to say the employer was less than

---

restriction related to pre-departure inspections does not support the conclusion that UPS regarded Fredricksen as significantly restricted in the major life activity of working. Thus, Fredricksen's argument regarding Crane's credibility cannot defeat summary judgment.

> perfectly frank does not prove that the employer acted as it did for
> discriminatory reasons.

*Id.* at 642. Thus, a court cannot "collapse the requirement [that the employee is disabled]. . . with the requirement that a plaintiff show that the defendant's reason for the employment action was pretextual." *Id.* at 641.

Like the court in *Nese*, this Court cannot rely solely on Fredricksen's assertion that the timing of Crane's restriction on performing pre-departure inspections establishes that UPS regarded Fredricksen as disabled. Instead, the Court must analyze the claim as the Seventh Circuit has long examined the "regarded as" claim. As noted above, Fredricksen must show that UPS was aware of his impairment and believed that the impairment significantly restricted his ability to work. *Id.* at 643. However, Fredricksen fails to submit sufficient evidence or argument in support of this proposition.

First, a reasonable jury could not conclude, based on Fredricksen's evidence, that UPS management regarded Fredricksen's medical condition as an impairment that significantly restricted his ability to work. Fredricksen submits that, prior to Crane's decision barring Fredricksen from conducting pre-departure inspections, he informed Crane of the possibility the he had leukemia and that the doctor suggested that Fredricksen should attempt to avoid stressful conditions. There is no evidence that Fredricksen elaborated on this possibility of leukemia, the potential effects of leukemia on Fredricksen's health or work performance, or the range of uncertainty as to whether preliminary tests would result in a diagnosis. Nor is there any evidence or argument that Fredricksen's subsequent discussions or medical note led UPS to believe that Fredricksen was significantly restricted in the activity of working. Given this absence of evidence, a reasonable jury could conclude that UPS believed Fredricksen's leukemia was a substantial impairment. *See, e.g.*,

*Cassimy v. Bd. of Educ.*, 461 F.3d 932, 932 (7th Cir. 2007) (employer did not regard plaintiff as disabled despite plaintiff informing the employer that he was being treated for depression and anxiety and employer's receipt of medical records indicating the same because plaintiff failed to show that the employer "held an exaggerated views about the seriousness of his illness"); *Hawkins v. George F. Cram Co.*, 397 F. Supp. 2d 1006, 1019 (S.D. Ind. 2005) (employer regarded plaintiff as substantially limited in the performance of manual tasks where the supervisor repeatedly inquired about plaintiff's limitations and commented on the impairment).

Second, even if the Court were to conclude that UPS held "exaggerated views about the seriousness of [Fredricksen's leukemia]," such evidence would not demonstrate that UPS regarded him as substantially limited in the major life activity of working. Plaintiff has failed to produce evidence in support of his argument that UPS believed he was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." On this point, the Court finds the Tenth Circuit's analysis in *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437 (10th Cir. 1996), instructive.

In *MacDonald*, plaintiff Lennon MacDonald, an aircraft mechanic, sued Delta Air Lines after he was terminated, claiming that Delta's knowledge of his vision problems caused Delta to regard him as having an impairment that substantially limited his ability to perform the duties of an airplane mechanic. 94 F.3d at 1443. In support of this claim, MacDonald noted that six months prior to his termination, MacDonald told a Delta supervisor that he believed he had a cataract that prevented him from performing his job. *Id.* at 1445. Less than two months before his termination, MacDonald failed an eye exam that he was required to pass in order to taxi aircrafts. *Id.* The *MacDonald* court

concluded that MacDonald's evidence established, at most, that Delta did not allow MacDonald to taxi aircrafts as a result of his failed eye exam. *Id.* Taxiing an aircraft was "neither 'a class of jobs,' nor 'a broad range of jobs in various classes.'" *Id.* Rather, the task was a "single, particular job." *Id.* Thus, when Delta disallowed MacDonald from taxiing aircrafts, such a prohibition did not establish that Delta regarded MacDonald as substantially limited in his ability to work. *Id.*

Similarly, in this case, Fredricksen argues that the restrictions placed on his ability to perform pre-departure inspections demonstrate that UPS regarded Fredricksen as substantially limited in his ability to work with the "full range of mechanics duties." The record does not support this contention. As illustrated by Fredricksen's testimony regarding the duties of a morning aircraft mechanic, performing pre-departure inspections was not a necessary part of being an "aircraft mechanic"; the morning-shift aircraft mechanic typically performed ASE inspections, not pre-departure inspections. In addition, despite the pre-departure inspection limitation, Fredricksen continued to work five days a week for at least eight hours and continued to perform all of his remaining job responsibilities.[13] The undisputed record evidence demonstrates that the ability to conduct a pre-departure inspection is "neither 'a class of jobs,' nor 'a broad range of jobs in various classes,' but is instead 'a single, particular job.'" *Id*; *see also Murphy v. United Parcel Serv.*, 527 U.S. 516, 523-24 119 S. Ct. 2133, 144 L. Ed. 2d 484 (1999) (hypertension that prevented plaintiff from obtaining the necessary health certification to maintain his mechanic job demonstrated that the plaintiff was regarded as unable to perform only the particular mechanic's job that required such

---

[13] Fredricksen also contends that he was "relegated" to back room filing duties "for the most part." The record reveals insufficient evidence for a trier of fact to decipher what "for the most part" means in context of Fredricksen's employment or how this shift in duties compared to the average mechanic. Consequently, this assertion also fails to demonstrate that UPS regarded Fredricksen as disabled.

certification). Thus, Crane's decision to bar Fredricksen from performing such inspections does not establish that UPS regarded Fredricksen as disabled.[14]

Furthermore, the Court notes that Fredricksen has failed to present any "'evidence of the number and types of other jobs' in the geographical region, from which he would be excluded because of his perceived impairments." *Kupstas*, 398 F.3d at 613 (*citing EEOC v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1017-18 (7th Cir. 2001)). A plaintiff relying on the major life activity of working claim must generally present some such evidence in support of his claim. *Id.* at 612. Fredricksen cannot satisfy his burden under 42 U.S.C. § 12102(2)(C) by showing that UPS believed that he could not perform a specific job or particular task. *Id.* at 614-15. Consequently, Fredricksen's failure to provide any evidence regarding the class or range of jobs for which he was otherwise qualified and from which UPS believed him to be excluded is "fatal" to Fredricksen's discrimination claims. *Id.* at 614; *see also Murphy*, 527 U.S. at 525 (failure to submit evidence demonstrating plaintiff was regarded as unable to perform any mechanic jobs rather than one specific mechanic job).

The Court concludes that Fredricksen's circumstantial evidence fails to present a triable issue as to whether UPS regarded Fredricksen as substantially limited in the major life activity working. The evidence presented supports, at best, an inference that Fredricksen's leukemia limited his ability to do a single, particular job. A perceived inability "to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(I).

---

[14] This conclusion is further reinforced by Fredricksen's testimony that, while at the O'Hare gateway, he submitted a bid for and received a position as a morning-shift aircraft mechanic at the Tucson facility. When UPS granted Fredricksen's bid for the vacant position, they did not impose a prohibition of the peformance of ASE inspections. Thus, a reasonable jury could not conclude from the pre-departure inspection restriction that UPS regarded Fredricksen as substantially limited in the major life activity of working.

Because the Court concludes, as a matter of law, that Fredricksen is not disabled within the meaning of the ADA, he is not protected by its substantive anti-discrimination provisions. Thus, the Court need not further address his discrimination and failure to accommodate claims. *See Squibb*, 497 F.3d at 787 (*citing Kampmier v. Emeritus Corp.*, 472 F.3d 930, 938-39 (7th Cir. 2007)).

## II.    Retaliation Claim

In addition to Fredricksen's disability discrimination claims, Fredricksen also contends that UPS took a number of actions against him in retaliation for his July 30, 2005 internal complaint and his August 23, 2005 EEOC charge.[15]   (Pl. Opp. Mem. 14.)   While the Court's conclusion that Fredricksen is not "disabled" forecloses any possibility of success on his discrimination claims, Fredricksen may still raise a viable retaliation claim if he can demonstrate that UPS retaliated against him for attempting to raise a good-faith claim under the ADA.[16]  *See Cassimy*, 461 F.3d at 938.

The ADA prohibits retaliation against any individual who has opposed an act or practice made unlawful by the ADA.  42 U.S.C. § 12203(a).  A plaintiff may establish his retaliation claim with direct or indirect evidence of retaliation. *See Squibb*, 497 U.S. F.3d at 786-88.  Under the direct

---

[15] While the record indicates that Fredricksen submitted additional internal complaints, Fredricksen's argument in support of his retaliation claims do not reference these complaints.  (Pl. Opp. Mem. 13-15.)  Instead, Fredricksen focuses on his July 30, 2005 internal complaint and his August 23, 2005 EEOC complaint.  (*See* Pl. Opp. Mem. 14 n.5.)  Fredricksen has failed to reference or develop arguments based on the remaining internal complaints.  Consequently, the Court will consider these arguments waived and focus solely on the July 30, 2005 and August 23, 2005 complaints. *See Culver v. Gorman & Co.*, 416 F.3d 540, 550 (7th Cir. 2005) (*quoting United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) ("In . . . [the Seventh Circuit], unsupported and undeveloped arguments are waived.'"); *see also Graham v. AT&T Mobility, LLC*, Nos. 06-3020, 06-3734, 2007 U.S. App. LEXIS 21598, at *12 (7th Cir. Sept. 6, 2007) (*quoting John v. Barron*, 897 F.2d 1387, 1393 (7th Cir. 1990)) ("[T]his court is not obligated to research and construct legal arguments open to parties, especially when they are represented by counsel.'").

[16] UPS does not contend that Fredricksen failed to raise his claims in good-faith and, therefore, this argument is deemed waived.  *See Culver*, 416 F.3d at 550.

method, the plaintiff must present of: (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two. *Burks,*, 464 F.3d at 758. To succeed under the indirect method of proof, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) he was performing his job satisfactorily; (3) he was subject to an adverse employment action; and (4) no similarly situated employee who did not engage in a protected activity suffered an adverse employment action. *Id.* at 759. The failure to satisfy one element of this prima facie case is "fatal" to the retaliation claim. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (*citing Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004)). If the plaintiff establishes these four elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action. *Cassimy*, 461 F.3d at 938 (*citing Mannie v. Potter*, 394 F.3d 977, 984 (7th Cir. 2005)). Once the defendant does so, the burden then shifts back to the plaintiff to show that the defendant's reason is pretextual. *Id.* (*citing Mannie v. Potter*, 394 F.3d 977, 984 (7th Cir. 2005)).

Fredricksen does not present direct evidence of retaliation. Instead, he proceeds under the indirect method of proof and asserts that UPS caused him the following four employment actions in retaliation for his two complaints: (1) delegating to Fredricksen the September 2005 TDY assignment; (2) initiating a fact-finding hearing on October 7, 2005 regarding a missing revision to a technical publications manual; (3) "refusing to expunge discipline" from Fredricksen's personnel file, such as the July 21, 2005 Notice of Intent to Suspend; and (4) Fredricksen "abandoning his family" in Chicago "to escape the hostile environment at the O'Hare gateway." (Pl. Opp. Mem. 14.) UPS does not contend that it is entitled to summary judgement because Fredricksen cannot meet the first two elements of the indirect method - whether Fredricksen engaged in a protected activity and

whether Fredricksen's job performance met his employer's legitimate expectations. Instead, UPS argues that there is no evidence that Fredricksen was subjected to an adverse employment action or that no similarly situated employees outside the protected class suffered an adverse employment action. Because the record indicates that Fredricksen engaged in a protected activity when he filed an internal complaint on July 30, 2005 and an EEOC charge on August 23, 2005, and because Fredricksen's claim fails on other grounds as described below, the Court will assume for analytical purposes that Fredricksen was meeting UPS's legitimate expectations.

As a preliminary matter, the Court must first address the proper standard for determining when an employment action constitutes an "adverse employment action" and when employees are deemed "similarly situated" for the purposes of an ADA retaliation claim. With respect to an "adverse employment action," the Seventh Circuit has generally defined this phrase broadly, concluding that the phrase encompasses: " readily quantifiable losses such as loss or reduction of pay or monetary benefits . . . [as well as] many other forms of adversity. . . [including], 'job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Silk*, 194 F.3d at 800 (*citing Smart v. Ball State Univ.*, 89 F.3d 437, 439 (7th Cir. 1996) and 42 U.S.C. § 12112(a)) (internal citations omitted). Fredricksen contends that the Supreme Court lowered this evidentiary standard in *Burlington Northern & Santa Fe Railway Co.*, 126 S. Ct. 2405, 2415 (2006). In *Burlington*, the Court concluded that, for the purposes of Title VII retaliation claims, the challenged action need only be one that a "reasonable employee would have found [to be] materially adverse," which means that the challenged action would have dissuaded a reasonable employee from making a charge of discrimination. 126 S. Ct. at 2415. This Court need not examine to what extent

*Burlington* affects the retaliation claim analysis under 42 U.S.C. § 12203(a) because, as explained below, Fredricksen's retaliation claim does not survive under the traditional standard or the *Burlington* standard.

In order for an individual to be similarly situated to the plaintiff, "a plaintiff must show that he is similarly situated with respect to performance, qualifications and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (internal citations omitted); *see also Burks*, 464 F.3d at 751. The similarly situated inquiry is not rigid or inflexible; it considers all relevant factors, the number of which will depend on the context of the particular case. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). With respect to those relevant factors, "an employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." *Id.*

For the sake of clarity, the Court will address each of Fredricksen's claimed adverse actions individually. *See Oest v. Ill. Dept. of Corrections*, 240 F.3d 605, 612-15 (7th Cir. 2001) (evaluating each alleged adverse action to test the viability of plaintiff's indirect method discrimination claim).

## A. Fredricksen's September 2005 TDY Assignment

Fredricksen contends that the forced TDY assignment, which UPS allegedly posted for six days rather than the CBA required seven days, constitutes an adverse employment action. Evidence regarding the nature of this assignment is sparse. The record reveals that Fredricksen was to assume the temporary assignment in Michigan in September 2005. This otherwise routine temporary assignment, without more, fails to establish a materially adverse action or that a reasonable employee would be dissuaded from making a charge upon receipt of such a task. *See, e.g., Roney v. Ill. Dept. of Trans.*, 474 F.3d 455, 461 (7th Cir. 2007) (it is unlikely that a reasonable employee would view a routine assignment as materially adverse); *see also Burlington*, 126 S. Ct. at 2417 ("reassignment of job duties is not automatically actionable"); *Silk*, 194 F.3d at 800 ("Minor or trivial actions that make an employee unhappy are not sufficient to qualify as retaliation under the ADA.").

Even if the Court were to assume that the TDY assignment was materially adverse, this claim also fails because Fredricksen does not identify much less present admissible evidence of any similarly situated individual outside the protected class who is directly comparable to the plaintiff "in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)*; see also Squibb*, 497 F.3d at 788. Thus, Fredricksen's September 2005 TDY assignment cannot form the basis of a retaliation claim under the ADA.

## B. Initiation of the October 2005 Fact-Finding Hearing

Fredricksen next argues that the initiation of a fact-finding hearing regarding a missing publication revision in October 2005 constitutes an adverse employment action. Fredricksen presents few details regarding the extent of this "fact-finding" hearing. Nevertheless, the Court need

not determine what effect, if any, this evidence would have on Fredricksen's retaliation claim because Fredricksen also fails to submit sufficient evidence to satisfy the "similarly situated" requirement. Fredricksen contends that UPS supervisors "usually" met with an employee to discuss missing revisions in the manual rather than initiating a fact-finding hearing. This general assertion is insufficient to support a retaliation claim. As noted above, Fredricksen must present evidence of an individual who is comparable in "all material respects." *Patterson*, 281 F.3d at 680. In this case, there is no specific testimony regarding the identity of these other individuals, the nature of their duties, their propensity to file grievances, their disciplinary histories, or the supervisors overseeing the individuals to show that they were similarly situated to Fredricksen in all material aspects. *See Bio. v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). Absent such a showing, Fredricksen's generalized assertions cannot support a retaliation claim. *See, e.g., Sublett,* 463 F.3d at 740 ("It. . . [is] up to . . . [plaintiff] to find others who . . . [are] "directly comparable in all material respects") (*citing Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)); *Oest*, 240 F.3d at 615 ("conclusory assertion[s]" that plaintiff was treated differently, without specific evidence in support of the assertions, will not satisfy the similarly situated requirement). To the contrary, the evidence presented by UPS suggests that UPS had previously engaged in at least one fact-finding hearing to investigate another technician's log-book- and company manual-related errors. Given the circumstances presented, the Court concludes that, as a matter of law, Fredricksen failed to establish the prima facie case of retaliation as it relates to the October 2005 fact-finding hearing.

## C. Alleged Refusal to Expunge Disciplinary Records

Fredricksen third alleged adverse action - the refusal to expunge disciplinary records - fails for the same reason. The Court need not address whether this action constitutes an adverse

employment action because, like the first two claims, Fredricksen's third claim fails under the similarly situated requirement. Specifically, Fredricksen offers no evidence or argument in an effort to establish that similarly situated individuals outside the protect class were not subjected to the same difficulties regarding UPS's "refusal" to expunge disciplinary records. *See Kampmier*, 472 F.3d at 940 (summary judgment is appropriate on a retaliation claim when plaintiff fails to identify similarly situated individuals); *Sublett,* 463 F.3d at 740 (*citing Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)).

## D. Fredricksen's Transfer to Arizona

Finally, Fredricksen asserts that he abandoned his family to "escape the hostile environment" at the O'Hare gateway.[17] (Pl. Opp. Mem. 14.) Presumably, Fredricksen is referring to his transfer to the Tucson, Arizona. Despite Fredricksen's assertion that his career "had come to an end," it is undisputed that Fredricksen was not terminated from his employment with the O'Hare gateway. Thus, it appears that Fredricksen relies instead on a theory of "constructive transfer," or "a transfer laid at . . . [Fredricksen's] doorstep in the causal sense." *White v. Dial Corp. (White I)*, 882 F. Supp. 701, 704 (N.D. Ill. 1994). Fredricksen failed to cite any legal authority expressly dealing with this

---

[17] In Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Fredricksen identifies as the fourth basis of actionable conduct, "Plaintiff abandoning his family in the Chicagoland area to escape the hostile environment at the O'Hare gateway." (Pl. Opp. Mem. at 14.) At first glance, it is unclear from this language whether Fredricksen attempts to assert a "hostile work environment" claim or a "constructive transfer/discharge" claim. Fredricksen cites no legal authority in support of either potential basis. While Fredricksen argued that UPS created a hostile work environment because Fredricksen was disabled (an argument this Court did not address because it previously concluded that Fredricksen is not disabled), there is no indication that he expected this argument to carry over to his retaliation claim. Given Fredricksen's focus on the "forced" transfer to Arizona and his failure to elaborate on or cite to any legal authority in support of a "hostile work environment" claim in his retaliation argument, the Court construes this final argument as one attempting to establish a "constructive transfer" rather than an argument for a "hostile work environment." As noted earlier, it is not the Court's duty to scour the record and contruct legal arguments for the parties. *See Graham*, 2007 U.S. App. LEXIS 21598, at *12 (*quoting John v. Barron*, 897 F.2d 1387, 1393 (7th Cir. 1990)) ("[t]his court is not obligated to research and construct legal arguments open to parties, especially when they are represented by counsel.'").

situation, either generally or in the context of ADA retaliation claims. (Pl. Opp. Mem. at 13-14.) While case law regarding the potential existence of such a claim is sparse, the courts that have discussed the potential viability of such a claim have drawn on the legal standard used to establish a constructive discharge. *See, e.g., Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1301-03 (11th Cir. 2006) (applying constructive discharge principles to plaintiff's constructive transfer argument, but noting that the court has yet to recognize the claim); *White v. Dial Corp.* (*White II*), No. 94-2448, 1995 U.S. App. LEXIS 7838 (7th Cir. 1995) (unpublished opinion) (applying constructive discharge standards to constructive transfer claim); *White I*, 882 F. Supp. at 704 (same). Consequently, this Court will do the same. Taking all evidence in the light most favorable to Fredricksen, the Court concludes that a reasonable finder of fact could not conclude that Fredricksen has shown a level of harassment constituting an actionable constructive transfer claim.[18] As such, this Court need not determine whether this cause of action actually exists in the context of an ADA retaliation claim.

To state a claim for a constructive discharge, or, in this case, a constructive transfer, a plaintiff must prove that the employer made his working conditions "so unbearable that a reasonable person in that employee's position would be forced to quit," or transfer. *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1032 (7th Cir. 2004) (*citing EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002)); *White II*, 1995 U.S. App. LEXIS 7838, at *6. The working conditions "'must be even more than the high standard for hostile work environment.'" *Roney*, 474 F.3d at 463; *White*, 1995 U.S. App. LEXIS 7838, at *6 ("Conduct that detracts from an individual's work

---

[18] UPS does not address whether a claim of retaliation stemming from a constructive transfer (or hostile environment) is cognizable under 42 U.S.C. § 12203(a). Because this Court concludes that Fredricksen has failed to present sufficient evidence in support of this claim, the Court need not address whether such a claim is actionable under 42 U.S.C. § 12203(a).

performance, hinders her advancement, or discourages her from remaining on the job can suffice to establish a hostile environment; but in order to establish a constructive discharge, the severity or pervasiveness of the abuse must be so great as to compel the reasonable person to resign.") (internal citation omitted).

In support of his constructive transfer claim, Fredricksen argues that he had no choice but to transfer because Fredricksen felt "his career had come to an end." (Pl. Opp. Mem. at 14.) Specifically, Fredricksen asserts that he: (1) "exhaust[ed]" attempts to "redress the harassing conduct" and observed that UPS "fail[ed] to adhere to its zero tolerance policy" when confronted with complaints regarding Mize and (2) "faced further attempts to discipline him and maintain a record for his discharge." (Pl. Opp. Mem. at 14.) Taking into account these assertions and drawing all reasonable inferences in favor of Fredricksen, the Court concludes that Fredricksen's constructive transfer claim fails as a matter of law for two reasons. First, Fredricksen has not shown that the conditions of his employment even approached the intolerable levels normally required in constructive discharge cases. *Compare, Roney*, 474 F.3d at 461-62 (no constructive discharge where employee was embarrassed and humiliated because of employer's treatment), *and Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1046-50 (no constructive discharge where co-worker told plaintiff to "[get] the f-- out of the office before I pop a cap in you're a--" and made racial comments), *with Taylor v. Wester & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (constructive discharge where employee's boss consistently made racial comments and, on one occasion, held a gun to the employee's head, took a picture, and later circulated it at a company meeting while making racial jokes). Second, Fredricksen admits that his transfer was at least partially motivated by his desire to live in a climate that would make him less susceptible to illness.

Such evidence does not reach the level of an abusive working environment necessary to sustain a constructive discharge, or in this case, "constructive transfer" claim. To be clear, the Court makes no judgment regarding whether such a claim may be advanced in the context of an ADA retaliation claim. The Court merely holds that, in light of prior case law regarding the concept of a "constructive transfer," Fredricksen could not establish a retaliation claim based on this theory.[19]

Because Fredricksen is unable to establish the prima facie case of retaliation, the Court grants summary judgment in favor of UPS on Fredricksen's retaliation claim. In addition, because Fredricksen is not disabled within the meaning of the ADA, the Court grants summary judgment in favor of UPS on Fredricksen's discrimination claims.

---

[19] The Court further concludes that, even if the Court interpreted this final claimed adverse action as a retaliatory harassment or retaliatory hostile work environment claim, Fredricksen still fails to establish a prima facie case for retaliation under the indirect method. Overlooking any weaknesses is his argument that UPS "harassed" Fredricksen or created a "hostile working environment" in response to his complaints, Fredricksen has failed to submit any evidence indicating that similarly situated employees who did not complain about the alleged discrimination were treated more favorably. In Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Fredricksen argues that he satisfied this element by submitting the following evidence: (1) testimony from Horning, Suchecki, and Batzel that UPS supervisors and management subjected Fredricksen to more harassing treatment than other AMTs at the O'Hare gateway and (2) testimony from Suchecki that viewed management's treatment of Fredricksen as retaliatory. (Pl. Mem. Opp. at 15.) As discussed above, conclusory assertions that are unsupported by specific facts are insufficient to create a genuine issue of triable fact. *Burks v. Wisconsin Dept. Of Trans.*, 464 F.3d 744, 752 (7th Cir. 2006). The testimony of other union stewards that Fredricksen, during an unspecified period of time, was harassed more often than other mechanics sheds no light on whether similarly situated employees who did not complain about alleged discrimination were treated more favorably. Similarly, Sucheki's statement is nothing more than a conclusory opinion. *Id.* (co-worker statement that supervisors were "setting [plaintiff] up to fail" could not create an issue of triable fact). Thus, Fredricksen has failed to submit sufficient evidence in support of his retaliation claim under the indirect method.

## CONCLUSION AND ORDER

For the reasons stated herein, Defendant's Motion for Summary Judgment is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:  March 31, 2008